IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| HAILEY NEDLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | |
| | ) | |
| UNUM GROUP CORPORATION | ) | ———————————————— |
| f/k/a UNUM PROVIDENT | ) | |
| CORPORATION; and UNUM LIFE | ) | |
| INSURANCE COMPANY OF | ) | |
| AMERICA; and LIFEPOINT | ) | |
| HEALTH WELFARE BENEFITS | ) | |
| PLAN, | ) | |
| | | |
| Defendants. | | |

## COMPLAINT

Plaintiff Hailey Nedley ("Plaintiff") brings this action for violations of the Employee Retirement Income Security Act of 1974 committed by Unum Group Corporation, f/k/a UnumProvident Corporation and Unum Life Insurance Company of America (collectively "Unum") relating to the provision of ERISA-governed disability benefits under the LifePoint Health Welfare Benefits Plan ("the Plan") sponsored by Plaintiff's former employer, LifePoint.  In support of the relief requested herein, Plaintiff alleges the following upon personal knowledge as to

1

herself and as to all other matters upon information and belief based upon, *inter alia*, the investigation made by and through her attorneys:

## **INTRODUCTORY STATEMENT**

1.     This is an action for legal and equitable relief seeking redress of violations of the Employee Retirement Income Security Act (hereinafter referred to as "ERISA").  This suit is brought pursuant to 29 U.S.C.  § 1132(a), to secure disability benefits due to Plaintiff through an ERISA welfare benefits plan sponsored by LifePoint and insured through a group insurance policy issued by Unum insuring the Plan.

2.     The Plaintiff seeks any and all benefits to which she may be entitled should this Court determine she is "disabled" under the terms of the Plan. Such benefits include all other available long-term disability benefits; waiver of premium benefits under disability, life, accidental death and dismemberment or accident policies issued or administered by Unum; and any other benefits available through The Plan, including those managed, administered or underwritten by Unum.

3.     Plaintiff seeks benefits based on the conditions documented in her medical records and other information before Unum. Plaintiff's disabling conditions include muscular dystrophy, an incurable and progressive condition with a hallmark of worsening over time.

4.     Importantly, for almost two years, Unum found Plaintiff's muscular dystrophy prevented her from performing fulltime work at even a sedentary level. But at just before the two-year mark on the claim, a Unum claims team made the remarkable determination that Plaintiff's muscular dystrophy miraculously had improved such that she was able to regain significant functionality, contrary to Unum's own earlier assessments and the vest weight of Plaintiff's medical evidence.

5.     For the reasons detailed below, this new claim decision by Unum's claims team which cuts directly against Unum's own previous determinations from its medical personnel is so transparent in its results-oriented approach due to its direct conflict with its previous assessments of this claim and the vast weight of Plaintiff's medical evidence that it presents a textbook example of what arbitrary and capricious decision-making means. It is as if the claims group that was assigned to Plaintiff's claim administration whimsically decided it needed to add another claim termination (something Unum internally describes as a "closure") to its tally, and Plaintiff's claim had the random and unfortunate luck of being selected.

## JURISDICTION

6.     Jurisdiction is appropriate under 28 U.S.C. § 1331 in that 29 U.S.C. §1132(e) confers jurisdiction upon the district courts of the United States where, as here, Plaintiff's claims relate to an "employee welfare benefit plan" and/or an

"employee pension plan" as those terms are defined within 29 U.S.C. § 1001, <u>et.</u>
<u>seq.</u> The Plan "may be found" within this district.

7.    Jurisdiction is further appropriate under 28 U.S.C. § 1332 in that the
matter in controversy exceeds the sum of $75,000, exclusive of interest and costs,
and diversity of citizenship exists between the parties.

8.    Venue is appropriate in this District Court pursuant to 29 U.S.C. §
1132(e)(2), in that the employee welfare benefit plan at issue was at least partly
administered in this District, the breaches of duty alleged herein occurred in this
District, and the Defendants may be found or reside in this District and, pursuant to
28 U.S.C. § 1391(b), in that the cause of action arose in this District.

## **PARTIES**

9.    As of the filing of this Complaint, Plaintiff Hailey Nedley is a resident
citizen of Alabama and this District.

10.    Defendant Unum Group Corporation is a foreign corporation that does
business by agent or otherwise in all counties in Alabama.

11.    Defendant Unum Group Corporation is a "fiduciary" of The Plan as
that term is defined by 29 U.S.C. § 1002(21).

12.    One of Unum Group Corporation's designated agents for service of
process is:

    c/o Corporation Service Company, Inc.
    641 South Lawrence Street

4

Montgomery, AL 36104

13.    Unum Group Corporation is an entity exercising authority or control respecting the management or disposition of The Plan assets or the personnel exercising said authority over The Plan assets.

14.    Unum Group Corporation is an entity providing services to The Plan at issue.

15.    Unum Group Corporation is an entity meeting ERISA's definition of a "party in interest" in this case as that term is defined by 29 U.S.C. § 1002(14).

16.    Defendant Unum Life Insurance Company of America is a foreign corporation that does business by agent or otherwise in all counties in Alabama.

17.    Unum Life Insurance Company of America is a "fiduciary" of The Plan as that term is defined by 29 U.S.C. § 1002(21).

18.    One of Unum Life Insurance Company of America's designated agents for service of process is:

> c/o Corporation Service Company, Inc.
> 641 South Lawrence Street
> Montgomery, AL 36104

19.    Unum Life Insurance Company of America is an entity exercising authority or control respecting the management or disposition of The Plan assets or the personnel exercising said authority over The Plan assets.

5

20.   Unum Life Insurance Company of America is an entity providing services to The Plan at issue.

21.   Unum Life Insurance Company of America is an entity meeting ERISA's definition of a "party in interest" in this case as that term is defined by 29 U.S.C. § 1002(14).

22.   Unum Life Insurance Company of America contracted with or presently has a contract for services with Defendant Unum Group Corporation, where Unum Group Corporation performs administrative functions for the Plan.

23.   Unum Life Insurance Company of America relies on employees provided through Unum Group Corporation for administrative functions for the Plan at issue.

24.   LifePoint Health Welfare Benefits Plan ("The Plan") is an "employee welfare benefit plan" as defined within 29 U.S.C. § 1001, et. seq., and may be served with process by serving: LifePoint Corporate Services, General Partnership, 330 Seven Springs Way, Brentwood, Tennessee 37027.

## THE PLAN

25.   Upon information and belief, The Plan at issue was funded, at least in part, by a long-term disability insurance policy sold by Unum Life Insurance Company of America, the company which also underwrote the policy.

26.     This long-term disability policy was purchased by Plaintiff's employer for the purpose of conferring a benefit upon Plaintiff and other employees.

27.     As a result, this policy qualifies as an employee welfare benefit plan as defined in 29 U.S.C. § 1002(1), and Plaintiff qualifies as a participant and/or beneficiary under The Plan as that term is used in 29 U.S.C. § 1132.

28.     Under the terms of The Plan providing for disability benefits, Plaintiff is "disabled" as defined by The Plan.

29.     On information and belief, although the Plan purports to confer discretion to Unum Life Insurance Company of America, the employees that administered Plaintiff's claim either were employed by a different entity or acted under the direction or control of Unum Group Corporation pursuant to a general services agreement, notwithstanding them having presented themselves to Plaintiff as employees of Unum Life Insurance Company of America.

## UNUM'S LIABILITY

30.     Plaintiff suffers from muscular dystrophy, a diagnosis eventually confirmed when Plaintiff went to the Mayo Clinic to learn why she could not seem to perform even simple physical tasks without great care after the birth of her second child.

31.     None of Unum's claims personnel, including Mr. Beaudette and his claims team which were responsible for the original termination of Plaintiff's LTD

benefit claim, dispute the validity of this diagnosis or even that it is a "progressive disease" in the claim file.

32.   In November 2019, not long after Plaintiff first lodged her claim for LTD benefits, Unum obtained responses to its Attending Physician Form from Dr. Bohannon, one of Plaintiff's treating physicians, that identified and explained Plaintiff's diagnosis and the impact it had on her functionality.   That detailed response was as follows:

**Physical Restrictions and/or Limitations**

If your patient has CURRENT PHYSICAL RESTRICTIONS (activities patient should not do) and/or PHYSICAL LIMITATIONS (activities patient cannot do) list below. Please be specific and understand that a reply of "no work" or "totally disabled" will not enable us to evaluate your patient's claim for benefits and may result in us having to contact you for clarification.

Pt is restricted from lifting, moving or transporting pts or objects greater than 15 lbs for more than 50% of the work day. This restriction decreases to less than 10 lbs after 50% of the work day has been performed due to increased fatigue as work is attempted. Pt is limited to standing/walking for more than 3-4 hours in a work day and needs hourly breaks of 5 minutes to accomplish this. Pt is unable to perform body mechanics such as bending, kneeling, squatting to provide patient care.

Please provide the duration of these restrictions and limitations. From (mm/dd/yy): 11/1/19   To (mm/dd/yy): lifetime or until a cure is found

**Behavioral Health Restrictions and/or Limitations**

If your patient has CURRENT BEHAVIORAL HEALTH RESTRICTIONS (activities patient should not do) and/or BEHAVIORAL HEALTH LIMITATIONS (activities patient cannot do) please list below. Please be specific and understand that a reply of "no work" or "totally disabled" will not enable us to evaluate your patient's claim for benefits and may result in us having to contact you for clarification.

N/A
→ After she presses herself beyond these limitations or performs physical works longer than 3-4 hours her increased fatigue places her at significant risk of falling or failing to safely provide needed care for patient.

Please provide the duration of these restrictions and limitations. From (mm/dd/yy): _____   To (mm/dd/yy): _____

What diagnostic or clinical findings support your patient's restrictions and/or limitations as noted above? elevated CPK level consistent 71000. Muscle biopsy that confirmed myopathy. EMG that further confirmed myopathy. Genetic testing that confirmed homozygous pathogenic alteration of FKRP gene. This test confirmed limb girdle muscular dystrophy.

What is your treatment plan? Please include all medications. There is currently no approved cure or treatment for patients diagnosis. Muscular dystrophy is chronic & progressive. She will continue to alternate visits with primary care office and her neurologist at Mayo Clinic every 6-9 months to assess progression. We will support her with assistive needs or therapy when those needs arise.

33.     One month later, Unum approved Plaintiff's claim for LTD benefits, finding her to be disabled from her occupation as a nurse under the policy.

34.     The claim note preceding that determination, however, did not explain at that point the basis for the determination made, and remained vague.  There is no discussion of the medical reasons for the decision made or documenting the forum discussion.[1]

35.     Less than 45 days after approving the claim, Unum received another statement from Dr. Bohannon that reiterated Plaintiff's inability to return to work in any fulltime position, even one having sedentary physical demands.   That assessment read as follows:

---

[1] It is highly irregular for an administrator, including an insurance company administrator with as large of a block of group policy business as Unum, not to have documented the reasons for any determination, especially one resulting in the approval of a benefit.  The absence of this documentation in this instance strongly suggests that Unum either has withheld such documentation from the Plaintiff in response to requests for the record or that this particular claims team's diligence in maintaining that claim file in this instance in accordance with Unum's internal procedures was substandard. Other such instances in the administration of this claim exist which cast further doubt on Unum's maintenance and disclosure of the materials defined under 29 C.F.R. § 2560.503-1

To whom it may concern:

It is my medical opinion that Hailey Nedley is able to work in a sedentary job position part time. I have been provided with the job description for an office assistant position at a local optometry office. I believe she will be able to complete the tasks and responsibilities described and expected of this position. The requirements mention the full use of hands and fingers for computer based work and she currently has no deficit or loss of function in her hands and fingers. Occasional walks around the office & occasional light lifting is described and neither of these fall within her restrictions. It appears that a majority of the job can be performed sitting at a desk. The option for part time hours will also provide her muscles with much needed time for rest and also physical therapy home exercises to maintain the functions and strength she still has at this point. I feel the pace of this part time job will be much better and manageable for her than the physicality and stress of full time staff nursing. We will continue to follow up with her regularly as patient to address her needs as they progress with muscular dystrophy and coordinate input from her neurologist at Mayo Clinic Jacksonville and her local cardiologist.

If you need further information related to this, please contact my office.

Sincerely,

Dr. Sean Bohannon

36. Dr. Bohannon's affirmations that Plaintiff is only "able to work in a sedentary job position part time" and that this limitation is necessary to "provide her muscles with much needed time for rest and also physical therapy home exercises to maintain the functions and strength she still has at this point" are critical parts of his assessment. Indeed, Unum Director Jeffrey Johnson clearly thought so too based on his claim note entered on March 26, 2020:

Medical:     The EE is a 33 year old RN (LifePoint) OOW since 11/1/19 due to muscular dystrophy. Per the LBS, the claim has been approved. Deemed that R/Ls are medically supported long term.

ER has advised EE that they would not have any positions that would be able to accommodate her needs should she be released to RTW with restrictions.

Earlier DOD consideration - 4/24/19 Mayo Clinic Note documented the EE's confirmed diagnosis and some challenges with walking.  Noted decreased gait, coordination, transfers and balance.  She was starting PT.

Based on the EE's diagnosis and symptoms at that time, it is reasonable to support the EE's inability to return to her prior level of capacity back to the 4/24/19 date.

ICD10:     G71.0 - muscular dystrophy; R53.83: fatigue

Duration: long-term

Follow up activity: n/a

Next Action Steps: Recommend sending management activity documenting rationale for earlier DOD. Continue to monitor work earnings. Based on p/t sedentary work capacity only, gainful options unlikely at CID.  PCT to review if BME calc needs to be updated and if partial earnings impact LTD benefits.  Once this has been addressed, consider referral to SB for ongoing management after update.

37.     This claim note documents Unum's correct and fully informed determination at the outset of Plaintiff's claim that not only was Plaintiff capable only of "p/t" – meaning <u>part time</u> – sedentary work, but the recognition at the time that due to the type of progressive and incurable condition Plaintiff had, that improvement was unlikely and that Plaintiff almost certainly would remain disabled beyond the "CID" (or "change in definition" date in the policy). In fact, precisely this same finding expressly follows throughout Plaintiff's claim administration almost until the final few months before it was abruptly closed.

38.     As the administration of Plaintiff's claim continued, entirely fresh reviews of Plaintiff's claim information continued to generate this same conclusion emanating from different reviewers within Unum. For example, in a March 31, 2021, review by Director Matthew Vail, Mr. Vail expressly recognizes that

11

Plaintiff's muscular dystrophy is a "progressive disease" by nature, meaning that is a disease that does not improve with time, but instead grows worse (i.e., "progresses").

39.     The following day, Dr. Bohannon returned another questionnaire that Mr. Vail's group sent him, this time asking for a general opinion as to his thoughts that Plaintiff was able to perform sedentary occupational demands "on a full-time (40 hour per week) basis." Dr. Bohannon's responded consistent with his previous records, statement and opinions as follows:

- Is Hailey Nedley able to perform the above occupational demands on a full-time (40 hour per week) basis?

  Yes___    No _✓_    I have no opinion regarding this patient's capacity___

  If yes, as of what date? _____

  If no, please explain.

  *Patient was diagnosed with Limb-Girdle muscular Dystrophy last year. Patient is now in clinical trial in VA*

40.     Three weeks later, Dr. Johnson returned the same questionnaire[2], responding as follows:

---

[2] Note this handwritten sentence which again affirms the progressive nature of Ms. Nedley's "proximal weakness that will not improve."

- Is Hailey Nedley able to perform the above occupational demands on a full-time (40 hour per week) basis?

Yes____   No ⤫   I have no opinion regarding this patient's capacity____

If yes, as of what date? _____

If no, please explain.   *She has progressive pain and weakness that will not improve*

40.   It was at this point that Unum, perhaps searching for *anything* it could use to justify adopting a different posture towards Plaintiff, contracted with HUB Enterprises for the completion of surveillance of Plaintiff.

41.   The surveillance report that followed, however, reports that out of 17 hours and 23 minutes of surveilling Plaintiff, the investigator assigned to perform the surveillance witnessed Plaintiff standing in her garage removing what the video shows to be an article of clothing on a hanger from the back of a vehicle.

42.   The narrative suggests this activity lasted for 3 minutes, while the video[3] shows only a few seconds before being turned off.

43.   Then on the following day, Plaintiff is seen leaving her home to take her daughters to Christian Services for Children, then driving to her part time job at

---

[3] In another indication of the cavalier approach Unum's employees in this instance took toward maintaining and providing a complete copy of what it had identified as the "record" for Plaintiff's claim, Unum originally withheld the two surveillance videos from its production of its claim file in this matter despite these videos clearly falling within the scope of that request under Department of Labor regulations.  Plaintiff would not have been provided with it if counsel had not sent a separate request to HUB Enterprises, because only then did Unum admit it possessed the videos and could provide them itself. This failure to provide a complete copy of the claim record suggests other items similarly may have been withheld, such as internal correspondence, reports and report drafts, and claim notes simply because they did not favor the outcome Unum's reviewers wanted to reach beginning in May/June 2021.

Primary Eyecare Center, then a few hours later, picking up her daughters and take them home.

44.   In other words, Plaintiff's demonstrated level of function was entirely consistent with what she and her doctors had been telling Unum all along, complete with Plaintiff needing to hold on to various things to support herself while walking and doing other things.

45.   It is telling that after the completion of this uneventful surveillance that the records and statements and previous findings by other Unum reviewers, including one medical reviewer and two different Directors, was then followed by yet *another* medical reviewer's conclusions in June 2021. Specifically, a June 21, 2021, claim note documents the following "Conclusion with Analysis and Rationale" reached by Senior Clinical Consultant Jennifer Stilkey, RN:

Conclusion with Analysis and Rationale: In summary, the EE went OOW in 04/2019 with a new diagnosis of limb girdle muscular dystrophy. SSDI has not been awarded as the EE works part time.
EE currently treats with a cardiologist, neurologist and a family medicine provider. FM and neurology have opined no to full time sedentary. Recent records note that she has exam findings of mild ataxia and proximal muscle weakness but has had very little progression in the past year. EE has mild dyspnea on exertion with normal spirometry. She does home PT exercises and reports some benefit from these. EE does not use an assistive device. Current reported activities include working part time in a sedentary job, 20 hours/week. 2 days 8 hours and 1 day 4 hours. EE gets her preschool age children ready in the morning and takes them to school. She reports difficulty lifting things below waist level and above chest level. EE can cook dinner and mop the floors but is unable to bathe her children as she cannot down to the bathtub. If a chair is too low, she cannot stand up. She avoids stairs and hills. The more she moves about, the more she loses stamina. In a recent activity check, EE's gait was wide based and cautious. She used a handrail to walk up a ramp. BRI reveals that the EE is somewhat active outside the home with her family. Barrier to full time work is muscle fatigue. ==Based upon review of available medical records, work activity and reports of activities when not at work, the EE has the FC for sedentary tasks, however, it is unclear if she could sustain these activities full time given the progressive nature of her disease and her symptomology.==

(highlighting added).

46.   Once again, it is found that Plaintiff, while capable of performing sedentary tasks for a time, cannot perform such sedentary tasks on a fulltime basis "given the progressive nature of her disease and symptomology."

47.   Then on June 22, 2021, Unum employee Dr. Sabrina Hammond, who has not appeared in the claim before, suddenly suggests in contradiction to **all** of the evidence in the claim file at that time that it is "unclear" to her why Plaintiff could not perform sedentary work on a fulltime basis. It appears that what she really was saying is that she disagreed with all the determinations and conclusions Unum had made up to that point in the claim file that it was clear that Plaintiff was unable to perform in this way – clear enough that Unum's claims notes confirmed approval of Plaintiff's claim on this basis several times over as identified above.

48.   Citing this completely innocuous surveillance showing Plaintiff's activity level to be in line with her reports and with previous assessments of her functional level and also a scattering of Facebook postings showing her at a handful of family functions over the course of six months, Dr. Hammond questioned these previous findings that Plaintiff was incapable of fulltime work.

49.   In yet another physician statement requested from Dr. Bohannon dated July 19, 2021, Dr. Bohannon squarely shot down this assertion.  When explaining his disagreement with Dr. Hammond, he reiterated Plaintiff's limited part-time functional capacity, as follows:



I feel that the patient is currently able to perform all duties listed under "Sedentary Work" above but do not feel like she would be able to do them 5 days per week. I also feel like she will not be able to perform these duties in the next 1-2 years due to progression of her disease.

Sean Bohannon, M.D.     7/19/21   Date

We are committed to making a timely claim decision in accordance with certain timeframes and governing laws. To ensure that your response is included in our evaluation, we would

50. Dr. Hammond, in an addendum review that then followed, outwardly revealed her bias, or at the very least her abject incompetence as a reviewer, when she noted Dr. Bohannon's disagreement above, but then wrote that "the medical information does not support any worsening of her condition…"

51. The painfully obvious defect of this statement from Dr. Hammond is that up to that point, Unum and Plaintiff's physicians had confirmed in multiple instances in the claim record that Plaintiff's condition up to that point *already* prevented her from being able to work in a sedentary capacity on a full-time basis. Therefore, it was wholly irrelevant whether Plaintiff's condition was worse for purposes of her continued eligibility for benefits. Rather, the only question relevant at this stage of its administration was whether Plaintiff's condition had **improved**. But Dr. Hammond made no finding on that point that is evidenced in the claim file.

52. Fellow Unum employee and reviewing physician Dr. Vaughn Cohan then participated in the review and performed just as poorly, if not dishonestly. Citing "video surveillance material" showing perhaps 10 minutes of aggregate

16

activity over a 17 hours and 23 minutes of total surveillance, he postulated that three minutes of getting items out of the back of a car, letting her daughters in and out of her vehicle, and walking to and from the building where she works parttime is "consistent with performance of sedentary job demands, and there is no documentation that would support limited hours/day or days/week."

53.   At the time Dr. Cohan issued this ridiculous statement, the posture of the claim was already such that Unum had expressly found several times in the claim record that there **was** such support.

54.   Despite that circumstance, Unum's claims team, citing these internally generated arguments against continued payment of Plaintiff's claim, issued its September 16, 2021, letter terminating and closing Plaintiff's LTD benefit.

55.   That both Unum doctors performed in this manner suggests an institutional bias against paying claimants (especially ones having significant amounts of benefit at issue like Plaintiff) and a coordinated effort to terminate as many claims as possible without regard to the actual evidence or without any notion of consistency in decision-making.

56.   Expressly noting the inconsistency Unum's termination decision represented and the biased decision-making it embodied, Plaintiff, through counsel she had since retained, sent to Unum a lengthy appeal on March 9, 2022, via facsimile and U.S. priority certified mail.

17

57.   Unum's receipt of Plaintiff's appeal via facsimile on March 9, 2022, is confirmed by a facsimile transmission report.

58.   Moreover, in a letter dated March 11, 2022, Unum independently confirmed its receipt of Plaintiff's appeal on March 9, 2022.

59.   On April 22, 2022, Ms. Lindsay Ross, Unum's "Lead Appeals Specialist" assigned to Plaintiff's appeal, left a voice message for Plaintiff Counsel in which Unum requested an extension for its time for deciding Plaintiff's appeal.

60.   In a letter bearing that same date, Plaintiff Counsel granted Unum's request for an extension by permitting it another 14 days, making the decision due on or before May 7, 2022.  Plaintiff Counsel also indicated to Ms. Ross that Plaintiff would not be able to agree to any additional extension without special circumstances having been identified in justification for the same.

61.   In its own letter of April 22, 2022, Unum, through Ms. Ross, confirmed the May 7, 2022, extension.

62.   Four days later, Plaintiff received from Unum a letter dated April 26, 2022, attaching a medical-records review performed by Dr. Matthew Lundquist.

63.   The letter requested that Plaintiff provide any response to Dr. Lundquist's review by May 11, 2022 and indicated further the need for an additional extension beyond the 14 days already granted.

64.   The only reasoning offered for this extension was Ms. Ross's reference

to Unum's need "to allow us time to review any relevant information you submit."

65.   On May 3, 2022, Plaintiff, through her Counsel, responded to Dr. Lundquist's review and also to Ms. Ross's attempt to invoke a second extension by fiat that exceeded the maximum of 90 days permitted by Plan terms and Department of Labor regulations.

66.   In that response, Plaintiff noted the acute failure by Dr. Lundquist to address the essential components of her appeal.  Among other things, Dr. Lundquist failed to identify any competent medical evidence showing Plaintiff's muscular dystrophy had improved which could justify Unum reaching a new decision contrary to its many previous determinations.

67.   Plaintiff further questioned Dr. Lundquist's strange statement that a functional capacity evaluation and medical examination result that she had submitted with her appeal showing her condition to continue to be disabling did not involve "direct observations" when these examinations were conducted in person and therefore very clearly observed by each examiner.

68.   Finally, Plaintiff questioned Dr. Lundquist's reliance of the surveillance that was conducted which Plaintiff had very clearly challenged on several grounds, none of which he addressed in his review.

69.   Plaintiff challenged Dr. Lundquist's review on other grounds as well as outlined in her Counsel's May 3, 2022, correspondence.

70.   Because Dr. Lundquist had very clearly failed to address so many questions critically important to her appeal which Unum's original decision-making had raised, Plaintiff sent back to Ms. Ross fifteen questions to be forwarded to Dr. Lundquist for response so that she could understand how Dr. Lundquist reached his otherwise thinly-reasoned and highly generalized conclusions.

71.   As part of that letter, despite Unum having failed to cite special circumstances that can justify its need for the remainder of its 45-day extension time (after taking into account the 14 days it had already used), Plaintiff indicated that she would give Unum until on or before June 7, 2022, to reach a decision so that an exchange of additional information had time to occur.  This date represented the maximum 90 days available to Unum for making a decision under Plan terms and Department of Labor regulations.

72.   In a letter dated May 9, 2022, Ms. Ross declined to procure a response to any of the inquiries Plaintiff raised that went to the essential grounds of her appeal. Further, she declined to provide *any* information about Dr. Lundquist's CV (which had also been requested).

73.   In a letter dated May 10, 2022, Plaintiff sent a letter responding to Ms. Ross challenging her refusal to consider the grounds she had raised in her appeal on the basis that it deprived her of any full and fair review promised by the Plan and relevant regulations.

74.   In light of that refusal, Plaintiff sent additional questions and requests to Ms. Ross which this time were directed to Unum itself as an attempt to discover information about the reasons behind its outright dismissal of Plaintiff's response and challenge to the sufficiency of Dr. Lundquist's review.

75.   Noting the bias that was being shown toward her and her claim, Plaintiff also requested that Unum supply information about matters informing Unum's consideration and treatment of her claim (such as financial incentives).

76.   As if the date of the filing of this Complaint, Plaintiff has not received any response to these requests, nor has she even received a written decision on her appeal.

77.   Accordingly, Plaintiff is now deemed to have exhausted her administrative remedies under Department of Labor regulations and Plan terms.

78.   Although there remain questions about the completeness of the materials Unum has produced in this case at various times, those materials known thus far to Plaintiff establish numerous breaches and errors committed by Unum while administering Plaintiff's claim, including:

      (a)   The targeting of Plaintiff's claim for denial because ERISA governs;

      (b)   The failure by Unum to take any meaningful measures to insulate its claims process from its inherent conflict under the Supreme

Court case *Glenn v. MetLife* and instead allowing its profit motive to influence its claims administration for Plaintiff;

(c)   The withholding of relevant documents and information from Plaintiff throughout the claims process and depriving Plaintiff of the ability to obtain a full and fair review of her claim;

(d)   Taking an adversarial posture against Plaintiff instead of a fiduciary posture by searching for ways to avoid paying part or all of her claim;

(e)   Failing to conduct an adequate investigation, and not considering and/or according proper weight to relevant, supportive information;

(f)   Failing to accord any weight to Plaintiff's medical providers and examiners who personally examined the Plaintiff on a regular basis, and instead dismissing their findings entirely;

(g)   Failing to adhere to the terms of the Plan and Department of Labor regulations, such as those governing the review of adverse benefit determinations, when a decision must be made;

(h)   Purposefully limiting and curtailing the review of its medical consultants and otherwise improperly exerting influence on them to opine against payment of benefits;

22

(i)     Unreasonably and arbitrarily overruling the professionals who personally examined Plaintiff;

(j)     Failing to address and respond to Plaintiff's appeal grounds, and in doing so, failing to provide Plaintiff with a meaningful appeal review;

(k)     Failing to engage in a meaningful dialogue with Plaintiff about her claim and granting her any level of access to its reviewers where questions could be presented that were directly relevant to her appeal; and

(l)     Unreasonably and arbitrarily overruling *its own* prior determinations that Plaintiff was permanently disabled without there being medical evidence of substantial medical improvement in Plaintiff's conditions.

79.     As set forth above regarding Unum's fiduciary breaches, Unum's claim decision was the product of a conflict of interest whereby it allowed its own financial interests to supersede its fiduciary obligations to Plaintiff.

80.     Employees who were responsible for the administration of Plaintiff's claim for benefits are eligible to receive bonuses and awards based at least in part on company profitability.

81.   Further, employees who had supervisory involvement and authority over Plaintiff's claims process participate in Unum Group Corporation's management incentive compensation program.

82.   Employees involved in the administration of Plaintiff's claim also participate in Unum Group Corporation's performance recognition program.

83.   To receive bonuses or awards under either the management incentive program or the performance recognition program, Unum Group employees must meet certain criteria.

84.   Satisfaction of the eligibility criteria for these programs is impacted at least in part by the denial and/or closure of claims like Plaintiff's.

85.   Unum's history of abusive claims practices reaches back for many years and includes documented policies of instructing, encouraging or incentivizing employees responsible for claims administration to deny claims, especially when that claim is found likely to be subject to ERISA.

86.   This strategy finds its inception in what has become known as the LeBeouf Report.

87.   The LeBeouf Report and internal documents relating to the same established a strategic approach that included an "ERISA Task Force" created by Unum for the implementation of standardized claims practices that encouraged employees to consider the applicability of ERISA during the administrative process

24

and then to target such claims for potential denial to "take advantage of ERISA protection."

88.   In an October 2, 1995 memorandum, Unum management-level employee Jeff McCall assessed the opportunities afforded by ERISA's application to aggressive handling of claims as follows:

> The advantages of ERISA coverage in litigious situations are enormous; state law is preempted by federal law, there are no jury trials, there are no compensatory or punitive damages, relief is usually limited to the amount of the benefit in question, and claims administrators may receive a deferential standard of review.   The economic impact on Provident from having policies covered by ERISA could be significant. As an example, Glenn Felton identified 12 claim situations where we settled for $7.8 million in the aggregate.   If these 12 cases had been covered by ERISA, our liability would have been between zero and $0.5 million.

> The key for determining the applicability of ERISA is whether or not the employer "sponsors" or "endorses" the plan.   If the employer <u>pays</u> the premium, the policy would usually, but not always, be considered to be governed by ERISA.   Salary allotment or payroll deduction arrangements, by themselves, do not necessarily mean that a policy is subject to ERISA.   While our objective is to pay all valid claims and deny invalid claims, there are gray areas, and ERISA applicability may influence our course of action.

Memorandum of Jeff McCall (a copy of the foregoing memorandum is included in Plaintiff's ERISA administrative record).

89.   Between 2002 and 2004, Unum was subjected to investigation by several state departments of insurance.   The announced purpose of that investigation was "to determine if the disability income claims handling practices of [Unum]

reflected systemic 'unfair claim settlement practices'" in violation of various state insurance laws.

90.   Upon completion of the investigation, examiners found many abuses, including unfair construction of evidence and evidentiary or contractual requirements for proving entitlement to benefits. (A copy of the foregoing document is included in Plaintiff's ERISA administrative record).

91.   After completion of this multi-state investigation in November 2004, Unum entered into a Regulatory Settlement Agreement ("RSA") whose terms required it to pay a substantial fine and to amend its claims practices.

92.   Unum, however, did not faithfully comply with the terms of the agreement, and instead engaged in an effort to better camouflage its pre-RSA claims practices.

93.   Not long after its execution of the RSA, Unum instructed its employees to continue to decide claims as they had done previously, notwithstanding Unum's forthcoming revision of its claims procedures to satisfy any future inspectors.

94.   As part of this resumption of its pre-RSA activities, Unum continued its incentivization programs aimed at closing claims and obtaining "recoveries" for Unum in the form of released reserves.

95.   Unum employees at the claim administration level continued to take part in a company bonus system and award program tied to company profitability.

96.     Unum employees at the claims level also continued to be evaluated on a regular basis for their efforts to achieve goals connected to the enhancement of corporate profits.

97.     As set forth above, to receive bonuses or awards under either the management incentive program or the performance recognition program, Unum Group employees must meet certain criteria.

98.     Satisfaction of the eligibility criteria for these programs is impacted at least in part by the denial and/or closure of claims like Plaintiff's.

99.     Unum's "Manager Toolkit" shows metrics included within these criteria involve claim closure or termination numbers, liability acceptance rates, and claim reopen rates.

100.    These values, individually or in the aggregate, may influence the award of performance compensation or consideration of corporate advancement opportunities.

101.    Unum even explicitly directs its management employees to filter information to those reporting to them, so their interests likewise justify with those of the overall company.

102.    As Unum's documents make clear, the more an individual or unit is perceived as contributing to the meeting of Unum's financial goals, the greater their share of the bonus pool.

103.   Unum also actively tracks the pursuit of goals for closing claims or recovering or conserving reserves on a regular basis and consistent basis through Weekly Tracking Sheets.

104.   According to Unum's claims procedures pertaining to IDI milestone reviews, these goal documents are made available to the claim directors, the very individuals charged with deciding whether claims will be approved or denied and whether open claims will be terminated.

105.   Unum also uses a "balanced business scorecard" approach at the director level to ensure claims personnel remain informed throughout the year on whether the company is meeting the financial goals necessary for the availability of bonus or incentive compensation.

106.   These scorecards are among those documents evidencing the continuation of Unum's earlier pre-RSA claims practices; other Unum documents have also specifically referenced goals, expectations, projections and targets for closures.

107.   This active conflict of interest under which Unum employees operate further calls into question the credibility of Unum's claims personnel and reviewers, such that no deference to the decision made here should be accorded.

108.   Unum considered the applicability of ERISA before making its decision.  This presents an additional reason for application of a *de novo* standard

to their claim decision, and to excuse the Plaintiff from further utilization of Unum's claim process.

109.   Unum did not provide Plaintiff with a meaningful opportunity for a full and fair review of her claim for benefits as required by 29 U.S.C. § 1133 and 29 C.F.R. 2560.503-1.

110.   Unum's decision process has not comported with 29 U.S.C. § 1133's requirement that any notice of the denial must contain the specific reasons for such denial, written in a manner calculated to be understood by the participant, and must comport with Department of Labor regulations.

111.   Plaintiff has exhausted all Plan remedies even though Unum's failure to adhere to Plan terms or ERISA requirements and regulations did not require it. As such, this case is ripe for judicial review.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Hailey Nedley respectfully requests this court find jurisdiction and venue appropriate, and after trial, grant the following relief:

a.   For an order awarding Plaintiff all benefits due and owing in accordance with the terms of the Plans and Policies identified in this Complaint, as well as all prejudgment interest due thereon as permitted by law and equitable principles, pursuant to 29 U.S.C. § 1132(a);

b.      For a judgment against Unum and the Plan awarding Plaintiff all costs and reasonable attorney's fees incurred connected to the prosecution of and pursuit of relief in this action as permitted under 29 U.S.C. § 1132(g)(1);

c.      For an order requiring Unum and the Plan to provide Plaintiff with any additional benefits to which the Plaintiff would be entitled pursuant to a finding that the Plaintiff is disabled under The Plan(s); and

d.      Such other relief as may be deemed just and proper.

Respectfully submitted,

M. Clayborn Williams
(ASB-9101-A43M)

**The Martin Law Group, LLC**
**Attorneys for Plaintiff**
P.O. Box 20087
Tuscaloosa, AL 35402-0087
Phone (205) 343-1771
Facsimile (205) 343-1781
clay@erisacase.com

**Plaintiff's Address:**

Hailey Nedley
c/o The Martin Law Group, LLC
P.O. Box 20087
Tuscaloosa, AL 35402

**<u>Defendants' Address:</u>**

Unum Group f/k/a Unum Provident Corporation
c/o Corporation Service Company
641 South Lawrence Street
Montgomery, AL 36104

Unum Life Insurance Company of America
c/o Corporation Service Company
641 South Lawrence Street
Montgomery, AL 36104

LifePoint Health Welfare Benefits Plan
LifePoint Corporate Services
General Partnership
330 Seven Springs Way
Brentwood, TN 37027